# UNITED STATES DISTRICT COURT FOR
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MICHIGAN REGIONAL COUNCIL OF CARPENTERS EMPLOYEE BENEFITS FUND; ABATEMENT WORKERS NATIONAL HEALTH AND WELFARE FUND; MONROE PLUMBERS & PIPEFITTER LOCAL 671 WELFARE FUND; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>Case No: _____<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, , and, on behalf of themselves and all others similarly situated, allege as follows:

## NATURE OF THE CASE

1.      This class action seeks to recover supracompetitive overcharges paid by purchasers of Hospital Healthcare Services (as defined herein) to hospitals in this State.

2.      Defendant Blue Cross Blue Shield of Michigan ("Michigan Blue Cross") has engaged in anti-competitive conduct involving at least 60 Michigan hospitals, including the execution and enforcement of "Most Favored Nation" ("MFN") agreements with the hospitals.

3.      An MFN agreement, sometimes called a "most favored pricing," "most favored discount," or "parity" agreement, requires the agreeing hospital either to charge other

commercial insurers for Hospital Healthcare Services at least as much as it charges Michigan Blue Cross ("Equal-to MFN" agreements), or to charge other commercial insurers *more* than it charges Michigan Blue Cross, usually by some fixed percentage ("MFN-plus" agreements).

4.      Both types of MFN agreement inhibit competition:

(A) MFN-plus agreements.

> Michigan Blue Cross has signed MFN-Plus agreements with at least 22 hospitals that require the hospitals to charge some or all other commercial insurers *more* than the hospitals charge Michigan Blue Cross, typically by a specified percentage differential.   These hospitals include major hospitals and hospital systems, and all of the major hospitals in some communities.  Defendant's MFN-plus clauses require that some hospitals charge Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds as much as 40% more than they charge Michigan Blue Cross.  Two hospital contracts with MFN-plus clauses also prohibit giving Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers better discounts than they currently receive during the life of the Michigan Blue Cross contracts.  Defendant's MFN-plus clauses guarantee that Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers cannot obtain Hospital Healthcare Services at prices comparable to the prices Michigan Blue Cross pays, which limits other health insurers' and purchasers' ability to compete with Michigan Blue Cross and obtain discounts and more favorable pricing for Hospital Healthcare Services.  Michigan Blue Cross has sought and, on most occasions, obtained MFN-plus clauses when hospitals have sought significant rate increases.

(B) Equal-to MFN agreements.

> Michigan Blue Cross has entered into agreements containing Equal-to MFN agreements with more than 40 small, community hospitals, which typically are the only hospitals in their communities, requiring the hospitals to charge other commercial health insurers at least as much as they charge Michigan Blue Cross.  Under these agreements, Michigan Blue Cross agreed to pay more to community hospitals, which Michigan Blue Cross refers to as "Peer Group 5" hospitals. A community hospital that declines to enter into these agreements would be paid approximately 16% less by Michigan Blue Cross than if it accepts the MFN agreement. Michigan Blue Cross has also entered into Equal-to MFN agreements with some larger hospitals.

5.     Michigan Blue Cross has sought and obtained MFN agreements in many hospital contracts in exchange for increases in the prices it pays for the hospitals' services.  In these instances, Michigan Blue Cross has purchased protection from competition by causing hospitals to raise the minimum prices they can charge to Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers, but in doing so has also increased its own costs.  Michigan Blue Cross has not sought or used MFN agreements to lower its own cost of obtaining Hospital Healthcare Services.

6.      Michigan Blue Cross currently has agreements containing MFN clauses or similar clauses with at least 60 of Michigan's general acute care hospitals.  Acute care hospitals are generally an important element of an effective provider network.

7.     Defendant's MFN agreements have caused many hospitals to (1) raise prices to Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers by substantial amounts, or (2) demand prices that are too high to allow Michigan Blue Cross' actual and potential competitors to compete effectively.  By denying Michigan Blue Cross' competitors access to competitive hospital contracts, the MFN agreements have deterred or prevented competitive entry and expansion in health insurance markets in Michigan, and increased prices for Hospital Healthcare Services sold to all non-Michigan Blue Cross purchasers, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,  and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

8.     Defendant Michigan Blue Cross' MFN agreements are *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Michigan Antitrust Reform Act,

MCL § 445.772,   and have artificially raised prices and restrained trade throughout the relevant markets.

9.      Michigan Blue Cross is by far the largest provider of commercial health insurance in Michigan.  Michigan Blue Cross' commercial health insurance policies cover more than three million Michigan residents, more than 60% of the commercially insured population of the State.

10.      Michigan Blue Cross insures more than nine times as many Michigan residents as its next largest commercial health insurance competitor.   The market share of Michigan Blue Cross in the sale of commercial health insurance in each of the relevant geographic markets described below is in some instances greater than 60% and in some instances less, but in all instances Michigan Blue Cross has sufficient market power to persuade agreeing hospitals to enter into MFN agreements that artificially raise prices for Hospital Healthcare Services in the relevant markets.

11.      Michigan Blue Cross competes with for-profit and nonprofit health insurers.

12.      Michigan Blue Cross is the largest non-governmental purchaser of Hospital Healthcare Services in Michigan.  As part of its provision of health insurance, Michigan Blue Cross purchases hospital services on behalf of its insureds from all 131 general acute care hospitals in the State.  Michigan Blue Cross purchased more than $4 billion in such hospital services in 2007.

13.      Plaintiffs seek to represent a Class of all individuals and entities ("Class") who purchased Hospital Healthcare Services at a rate contracted for by Michigan Blue Cross or one of its competitors directly from a hospital with which Michigan Blue Cross entered into an

agreement that included an MFN clause or its equivalent from at least as early as January 1, 2007 to the present (the "Class Period").

14.     Because of Michigan Blue Cross' unlawful conduct, Plaintiffs and the Class paid artificially inflated prices for Hospital Healthcare Services and, as a result, have suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

16.     Plaintiffs have been injured, and are likely to continue to be injured as a result of Defendant's unlawful conduct.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has pendant and ancillary jurisdiction over the claim under Section 2 of the Michigan Antitrust Reform Act, MCL 445.772, pursuant to 28 U.S.C. § 1337.

18.     Defendant Michigan Blue Cross maintains its principal place of business and transacts business in this District, and is subject to the personal jurisdiction of this Court. Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26. Michigan Blue Cross has entered into contracts containing MFN clauses with hospitals in this District. Michigan Blue Cross' conduct has artificially raised prices for Hospital Healthcare Services in this District. Venue in this District is also proper pursuant to 28 U.S.C. § 1391.

## DEFINITIONS

19.     As used herein,

5

a.   the term "Hospital Healthcare Services" refers to services that are ordinarily provided by hospitals, including primary, secondary, and tertiary services. These include, but are not limited to, obstetrical and pediatric services, psychiatric care, neurosurgery, radiation therapy, cardiology services, orthopedics, trauma centers, diagnostic centers, cancer treatments, internal medicine, and general surgical services.

b.   "Class Period" refers to the period from January 1, 2007 to the present.

## INTERSTATE COMMERCE

20.   Defendant Michigan Blue Cross is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.  Artificially increased prices for hospital services and health insurance caused by Defendant's MFN agreements are, in some cases, paid by health insurers, self-insured employer health plans, and other consumers across state lines.  Michigan Blue Cross and other insurers provide commercial health insurance that covers Michigan residents when they travel across state lines.

## PARTIES

**A.       Michigan Blue Cross**

21.   Defendant Michigan Blue Cross is a Michigan nonprofit healthcare corporation headquartered in Southfield, Michigan.  Directly and through its subsidiaries, Michigan Blue Cross provides commercial and other health insurance products, including preferred provider organization ("PPO") health insurance products and health maintenance organization ("HMO") health insurance products.

6

**B.**      **Plaintiffs**

22.      Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund is located in Michigan.  Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund  paid for, or became obligated to pay for Hospital Healthcare Services at a rate contracted for by Michigan Blue Cross or one of its insurer competitors directly from one or more of the hospitals with which Michigan Blue Cross had an agreement that contained an MFN clause or its equivalent.  As a result of Michigan Blue Cross' anticompetitive conduct, Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund paid or is obligated to pay artificially inflated prices for Hospital Healthcare Services and was therefore injured by reason of the antitrust violations alleged herein.

23.      Plaintiff Abatement Workers National Health and Welfare Fund is a resident of Michigan.   Plaintiff Abatement Workers National Health and Welfare Fund  paid for, or became obligated to pay for Hospital Healthcare Services at a rate contracted for by Michigan Blue Cross or one of its insurer competitors directly from one or more of the hospitals with which Michigan Blue Cross had an agreement that contained an MFN clause or its equivalent. As a result of Michigan Blue Cross' anticompetitive conduct, Plaintiff Abatement Workers National Health and Welfare Fund paid or is obligated to pay artificially inflated prices for Hospital Healthcare Services and was therefore injured by reason of the antitrust violations alleged herein.

24.      Plaintiff Monroe Plumbers & Pipefitter Local 671 Welfare Fund is located in Michigan.  Plaintiff Monroe Plumbers & Pipefitter Local 671 Welfare Fund paid for, or became

obligated to pay for Hospital Healthcare Services at a rate contracted for by Michigan Blue
Cross or one of its insurer competitors directly from one or more of the hospitals with which
Michigan Blue Cross had an agreement that contained an MFN clause or its equivalent.  As a
result of Michigan Blue Cross' anticompetitive conduct, Plaintiff Monroe Plumbers & Pipefitter
Local 671 Welfare Fund paid or is obligated to pay artificially inflated prices for Hospital
Healthcare Services and was therefore injured by reason of the antitrust violations alleged
herein.

## FACTUAL BACKGROUND: COMMERCIAL HEALTH INSURANCE IN MICHIGAN

25.     In Michigan, as throughout the United States, individuals who are not eligible
for Medicare or Medicaid (i.e. people who are not disabled, elderly, or indigent) typically obtain
health insurance from commercial health insurance companies.

26.     Employed individuals often obtain health insurance through their employers,
which may pay a share of insurance premiums.  Employed individuals may also obtain health
insurance from union-based plans such as Plaintiffs' herein.

27.     Such union-based plans reflect a supportive concern by the unions for their
members, but are in all respects relevant to this Complaint the same as employer-based health
insurance for individuals.  Hereafter, references in this Complaint to employer-based health
plans and employers are intended to also refer to union-based health plans and unions.

28.     Commercial health insurers compete to be chosen by employers, employees and
self-insured employer plans and others based on the quality and breadth of their health care
provider networks, the level of benefits provided (including out-of-pocket costs in the form of
deductibles, co-payments, and coinsurance), price, customer service, reputation, and other

factors.  Employers and some other groups typically select the insurance plan or plans they offer to their employees or group members.  Employees or group members then choose whether to enroll in the group health insurance coverage offered to them and, if multiple health insurance plans are offered, choose among the plans offered.

29.     Employers provide group health insurance on either a "fully insured" or a "self-insured" (sometimes called "self-funded") basis.  Under fully insured health insurance policies, the insurer bears the risk that health care claims will exceed anticipated losses.  Under self-insured health insurance policies, the employer pays its employees' insured medical costs itself, so a large portion of that risk is borne by the employer (often subject to stop-loss insurance).

30.     Employers that self-insure usually enter into "administrative services only" ("ASO") agreements with health insurers to obtain access to a health care provider network at favorable prices, and for administrative services such as claims processing.  The health insurers that provide these services for self-insured employer plans with employees in a particular region are generally the same insurers that provide fully insured health insurance in that region.

31.     Michigan Blue Cross is the largest provider of ASO services in Michigan, including to the State of Michigan.  Michigan Blue Cross processed almost $11 billion in health care claims for self-insured employer plans in 2009.  Approximately half of Michigan Blue Cross' commercial health insurance business is self-insurance business.  Michigan Blue Cross earned more than $750 million in ASO fees in 2009.

32.     Most health insurance plans provide insureds with access to a health care provider network including hospitals and physicians.  Under these plans, insureds receive greater benefits when obtaining health care services from providers that participate in the insurer's

provider network.  When an insured receives service from a provider in the insurer's network, the insurer or self-insured employer pays the health care provider at prices and terms negotiated between the insurer and the provider, and the patient often pays a co-pay, a deductible, or a portion of the cost specified in the insurance policy.

33.     Network contracts between insurers and providers typically prohibit the provider from "balance billing" (charging the patient more than the allowable amount agreed to between the insurer and the provider).  The costs of medical care are typically 80% or more of insurers' costs, and hospital costs are a substantial portion of medical care costs.  Accordingly, insurers' hospital costs are an important element of insurers' ability to offer competitive prices for its insurance offerings.

34.     Hospitals and commercial health insurers generally negotiate a discount to be applied to a standardized hospital fee schedule. The standardized schedule could be set forth as a master list of hospital fees for services, a schedule of fees for treatment of a particular illness (typically based on "diagnosis-related groups" or "DRGs" as defined by Medicare and Medicaid), or on another basis.  Michigan Blue Cross' equal-to MFN contracts typically require that hospitals not grant other commercial health insurers better discounts from the fee schedules than Michigan Blue Cross receives.  Michigan Blue Cross' MFN-plus contracts typically require that hospitals not grant other commercial health insurers discounts within a specified percentage of Michigan Blue Cross' discounts.

## DEFENDANT'S MFN AGREEMENTS AND THEIR ANTICOMPETITIVE EFFECTS

### A.     The MFN Agreements and their Terms

35.     As alleged above, Michigan Blue Cross is able to obtain MFN agreements in

many of its agreements with Michigan hospitals.  In some contracts, Michigan Blue Cross requires the hospital to contract with any other commercial insurer at rates at least as high as the hospital contracts with Michigan Blue Cross – an Equal-to MFN agreement.  In others, Michigan Blue Cross demands even more and requires the hospital to contract with other insurers at rates *higher* than those paid by Michigan Blue Cross, typically by a specified percentage differential – an MFN-plus agreement.

36.     Defendant Michigan Blue Cross' contracts with MFN clauses typically include some arrangement with the contracting hospital that permits verification of compliance by Michigan Blue Cross.  Often, the contract will require the hospital to certify annually to Michigan Blue Cross that the hospital is complying with the MFN agreement, and give Michigan Blue Cross the right to audit compliance.  A hospital seeking to avoid a finding of non-compliance and a resulting payment reduction by Michigan Blue Cross – generally its largest commercial payer – may contract with Michigan Blue Cross' competitors at prices even higher than the MFN agreement requires, to avoid being penalized if Michigan Blue Cross audits the hospital's compliance with the MFN agreement.  An additional possible anticompetitive consequence of the MFN verification procedure is that it could afford Michigan Blue Cross an otherwise unavailable insight into what its rivals are paying to the hospital.

37.     Michigan Blue Cross' agreements with at least 22 Michigan Hospitals contain MFN-plus clauses. These hospitals are among the most important providers of hospital services in their respective areas.  The following hospitals or hospital systems have agreements with Michigan Blue Cross with MFN-plus clauses:

a.     Marquette General Hospital, the largest hospital in the Upper

Peninsula and the only Upper Peninsula hospital providing tertiary care, where Michigan Blue Cross' contract requires the hospital to charge Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds at least 23% more than the hospital charges Michigan Blue Cross.

b.    Sparrow Hospital, the largest hospital in Lansing, where Michigan Blue Cross' contract requires the hospital to charge some of Michigan Blue Cross' significant competitors and all non-Michigan Blue Cross purchasers and insureds at least 12.5% more than the hospital charges Michigan Blue Cross.

c.    Ascension Health, Michigan's largest hospital system, which owns nine general acute care hospitals subject to an MFN-plus agreement, including the St. John Providence Health System in the Detroit MSA (five hospitals), Borgess Health in the Kalamazoo MSA, Genesys Regional Medical Center in the Flint MSA, St. Mary's Medical Center in Saginaw, and St. Joseph Health System in Tawas City.  Michigan Blue Cross' contract with Ascension requires that Ascension's hospitals charge Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds at least 10% more than the hospitals charge Michigan Blue Cross.  Michigan Blue Cross agreed to pay Ascension higher rates for hospital services, resulting in Michigan Blue Cross' paying an additional $2.5 million annually for this MFN-plus agreement.

d.    Alpena Regional Medical Center in Alpena, Botsford Hospital in Farmington Hills, Dickinson Memorial Hospital in Iron Mountain, and Munson Medical Center in Traverse City.

e.    Metro Health Hospital in Grand Rapids, where Defendant's MFN agreement requires the differential between Michigan Blue Cross and other payers to increase over time, to 5% for HMOs and 10% for PPOs.

f.    Two Mid-Michigan Health Hospitals (Midland and Gratiot), where Defendant's MFN agreement requires the hospitals to charge Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds at least 14% more than the hospital charges Michigan Blue Cross.

g.    Both hospitals in Saginaw — Covenant, where Michigan Blue Cross' contract requires the hospital to charge most of Michigan

12

Blue Cross' competitors and most non-Michigan Blue Cross purchasers and insureds at least 39% more than the hospital charges Michigan Blue Cross, and St. Mary's, identified above.

h.    Three Beaumont Hospitals in the Detroit MSA (Royal Oak, Troy and Grosse Pointe), where Defendant's MFN agreement requires the hospital to charge Michigan Blue Cross' significant competitors and most non-Michigan Blue Cross purchasers and insureds at least 25% more than they charge Michigan Blue Cross.

38.    In 2007, Michigan Blue Cross entered into a "Participating Hospital Agreement" ("PHA") containing an equal-to MFN agreement with each of more than 40 hospitals it classifies as "Peer Group 5" hospitals: small, rural community hospitals, which are often the only hospital in their communities.  Under that agreement, Michigan Blue Cross committed to pay more to those community hospitals that agreed to charge all other commercial insurers rates that would be at least as high as those paid by Michigan Blue Cross.  Any community hospital that failed to attest to compliance with the MFN agreement would be penalized by payments from Michigan Blue Cross at least 16% less than if it complied with the MFN provisions.

**B.    Anticompetitive Effects of Defendant's MFN Agreements**

39.    Michigan Blue Cross' existing MFN agreements, and the additional MFN agreements that Michigan Blue Cross is likely to seek to include in future agreements with Michigan hospitals, have unreasonably lessened competition and are likely to continue to lessen competition by:

a.    Maintaining a significant differential between Michigan Blue Cross' hospital costs and its rivals' costs at important hospitals, which prevents those rivals from lowering their hospital costs and becoming more significant competitive constraints to Michigan Blue Cross;

b.    Raising hospitals' prices to Michigan Blue Cross' competitors and

13

  c.  Establishing a price floor below which important hospitals would not be willing to sell hospital services to other commercial health insurers, self-insured employer health plans, or other purchasers of hospital services and thereby deterring price competition in the markets for commercial insurance and hospital services; and

  d.  Limiting the ability of other health insurers to compete with Michigan Blue Cross by raising barriers to entry and expansion, discouraging entry, and preserving and enhancing Michigan Blue Cross' leading market position.

  40.  Michigan Blue Cross often receives substantially better discounts for hospital services than other commercial health insurers.  Michigan Blue Cross knows that its discounts provide a competitive advantage against other health insurers.  Michigan Blue Cross noted in April 2009 that its "medical cost advantage, delivered primarily through its facility [i.e., hospital] discounts, is its largest source of competitive advantage," and earlier stated that its advantages in hospital discounts "have been a major factor in its success in the marketplace."

  41.  In recent years, Michigan Blue Cross became concerned that competition from other insurers was eroding its hospital discount advantage. Michigan Blue Cross therefore sought to preserve its discount advantage by obtaining MFN-plus agreements, with the "expectation . . . that we would not have any slippage in our differential from what we experience today."  In other words, rather than seeking lower prices from hospitals, Michigan Blue Cross negotiated MFN-plus clauses to maintain its discount differential and prevent potential competitors and all non-Michigan Blue Cross purchasers and insureds from obtaining hospital services at prices close to Michigan Blue Cross' prices and thereby becoming more significant competitive constraints on Michigan Blue Cross.  During negotiations in 2008 with one hospital in Grand

Rapids, Michigan Blue Cross wrote that "we need to make sure they [the hospital] get a price increase from Priority if we are going to increase their rates."

42.     In many cases, Michigan Blue Cross obtained an MFN agreement from a hospital by agreeing to increase its payments to the hospital. Michigan Blue Cross has sought and often obtained MFN-plus clauses when hospitals have sought significant rate increases. Michigan Blue Cross also agreed to increase rates to Peer Group 5 hospitals as part of the Peer Group 5 PHA, which included an equal-to MFN agreement. Had a hospital not accepted an MFN agreement, Michigan Blue Cross likely would not have agreed to pay the higher rates sought by the hospital. Thus, the likely effect of the MFN agreement has been to raise the prices of hospital services paid by both Michigan Blue Cross and its competitors and all non-Michigan Blue Cross purchasers and insureds, and to increase health insurance prices charged by Michigan Blue Cross and its competitors.

43.     Defendant's MFN agreements have resulted and are likely to continue to result in these anticompetitive effects in each of the relevant geographic markets because they effectively create a large financial penalty for hospitals that do not accept them. Michigan Blue Cross patients are a significant part of these hospitals' business, and Michigan Blue Cross patients typically are more profitable than Medicare and Medicaid patients, the hospitals' other most significant sources of business. A hospital that would otherwise contract with a competing insurer at lower prices than it charges Michigan Blue Cross would have to lower its prices to Michigan Blue Cross pursuant to the MFN agreement if it sought to maintain or offer lower prices in contracts with other commercial insurers. The resulting financial penalty discourages a hospital with an MFN agreement from lowering prices to health insurers competing with

Michigan Blue Cross or other purchasers of hospital services.  Defendant's MFN agreements have caused hospitals to raise prices charged to other commercial health insurers and purchasers, rather than lower prices to Michigan Blue Cross.

44.     Prior to Michigan Blue Cross' obtaining MFN agreements, some hospitals gave greater discounts to some other commercial health insurers than they gave to Michigan Blue Cross.  Without Defendant's MFN agreements, some hospitals had an incentive to offer lower prices to other insurers seeking to enter or expand in the hospital's service area and increase competition in the sale of commercial health insurance.

45.     Some of Defendant's MFN agreements allow for exceptions, but they are *de minimis*.  For example, Defendant's MFN agreement with Sparrow Hospital applies to a "significant non-governmental payor . . . whose charges exceed 1.0% of [Sparrow's] total gross patient service charges." The hospital can charge lower prices to an insurer that does not cross the *de minimis* threshold.  An increase in that insurer's business at the hospital, however, would trigger the MFN agreement and subject the prices the insurer pays Sparrow to the MFN agreement's threshold.  Michigan Blue Cross' contract with Beaumont Hospitals has similar provisions.  A clause of this type is likely to have the anticompetitive effect of limiting the growth of commercial health insurers with small shares and more favorable discounts than Michigan Blue Cross.

46.     Michigan Blue Cross' use of MFN agreements has caused anticompetitive effects in the markets for commercial health insurance in the geographic markets specified in this Complaint, among others.   Hospitals in these markets have raised prices to some commercial health insurers, and declined to contract with other commercial health insurers at

16

competitive prices.  As a result, commercial health insurers that likely would have entered local markets to compete with Michigan Blue Cross have not done so, or have competed less effectively than they would have without the MFN agreements.  Defendant's MFN agreements therefore have helped Michigan Blue Cross maintain and enhance its market power in those markets.  The actual anticompetitive effects alleged below, including increased prices for hospital services, illustrate the types of competitive harm that have occurred and are likely to occur where Michigan Blue Cross obtains MFN agreements from hospitals throughout Michigan.

### *1. Marquette and the Upper Peninsula*

47.   In 2008, Michigan Blue Cross entered into a provider agreement with Marquette General Hospital that contained an MFN-plus clause requiring Marquette General to charge other insurers at least 23% more than it charges Michigan Blue Cross – a cost differential that would severely limit a competitor's ability to compete with Michigan Blue Cross. Michigan Blue Cross agreed to pay significantly higher prices for hospital services at Marquette General in exchange for an MFN-plus agreement.

48.   Michigan Blue Cross is by far the largest commercial health insurer in the Marquette area and in the Upper Peninsula, with more than 65% of the commercially insured population of the eleven counties of the western and central Upper Peninsula (identified above). Michigan Blue Cross views the Upper Peninsula as a strategically important region, and believes that "no competitor of size exists in the UP as of today."  Michigan Blue Cross raised its health insurance premiums in the Upper Peninsula by 250% from 1999 to 2004, "well out of proportion to the rest of the state," according to a Michigan Blue Cross document.

17

49.     Marquette General, a 315-bed tertiary care hospital, is the largest hospital and the only tertiary care hospital in Michigan's Upper Peninsula.  Marquette General offers more complex surgeries (such as neurosurgery and cardiac surgery), trauma care, and other services that are not available at any other hospital in the Upper Peninsula.  The closest tertiary care hospital to Marquette is in Green Bay, Wisconsin, 178 miles away; the closest tertiary care hospital in Michigan is in Petoskey, in the northern Lower Peninsula, 203 miles away.

50.     Because a commercial health insurer must provide its subscribers with reasonable access to tertiary hospital care to be able to market a health insurance product, commercial health insurers that seek to market a competitive health insurance plan in the central and western Upper Peninsula must contract with Marquette General at prices that are competitive with Michigan Blue Cross' prices.  The MFN clause prevents Marquette General from contracting with other commercial health insurers at prices competitive with Michigan Blue Cross' hospital prices.

51.     There are several small, community hospitals in the Upper Peninsula.  These hospitals – particularly those in the central and western portions of the Upper Peninsula – generally refer their more complex cases to Marquette General.  Eleven of the thirteen smaller hospitals in the Upper Peninsula – Baraga County Memorial in L'Anse, Bell Memorial in Ishpeming, Grand View Health in Ironwood, Helen Newberry Joy in Newberry, Iron County Community in Iron River, Aspirus Keewenaw in Laurium, Mackinac Straits in St. Ignace, Munising Memorial in Munising, Ontonagon Memorial in Ontonagon, Portage Health in Hancock, and Schoolcraft Memorial in Manistique — are Peer Group 5 hospitals and are subject to the equal-to MFN agreements in Michigan Blue Cross' Peer Group 5 PHA.

18

52.     The only hospitals in the Upper Peninsula that do not currently have MFN clauses in their contracts with Michigan Blue Cross are Chippewa County War Memorial Hospital in Sault Ste. Marie, 165 miles from Marquette, and OSF St. Francis Hospital in Escanaba.  Because of its relatively limited scope of services and distance from Marquette, Chippewa War Memorial is not a good alternative to Marquette General for residents of the western or central Upper Peninsula, where 84% of the Upper Peninsula's population resides. OSF St. Francis also is not a tertiary care hospital and does not offer the range of services offered by Marquette General.  Insurers likely would not market a health plan with a network including Chippewa War Memorial and/or OSF St. Francis, but lacking Marquette General, to residents of the western or central Upper Peninsula.

53.     Priority Health, a Michigan nonprofit health insurer based in Grand Rapids, sought to enter the market for commercial health insurance in the Upper Peninsula and compete with Michigan Blue Cross. Without Defendant's MFN-plus arrangement, Marquette General could have given Priority a discount that would have allowed Priority to compete with Michigan Blue Cross, and Priority could have marketed and provided commercial health insurance in the Upper Peninsula.  However, Marquette General told Priority it would not offer Priority rates less than those required by Defendant's MFN-plus agreement.  Marquette General accordingly gave Priority a revised offer with significantly higher rates to comply with Defendant's MFN-plus requirement.

54.     Priority, which had believed it could compete with Michigan Blue Cross and attract business if it contracted with Marquette General at rates comparable to those of Michigan Blue Cross, concluded that it could not compete with rates at the Upper Peninsula's principal

19

hospital at the level required by Defendant's MFN-plus arrangement.  Priority therefore declined to contract with Marquette General at the rates required by the MFN agreement, and did not enter the market for commercial health insurance in the Upper Peninsula.  As a result, Michigan Blue Cross maintained its leading market share in the commercial health insurance market in the central and western Upper Peninsula.  Other commercial health insurers, including Assurant and Health Alliance Plan ("HAP"), also could have entered into agreements with Marquette General if they had been able to contract with Marquette General at prices comparable to the prices Michigan Blue Cross pays to Marquette General.

55.     When Michigan Blue Cross entered into the MFN-plus agreement with Marquette General, Michigan Blue Cross knew that Marquette General was considering entering into contracts with other commercial health insurers.  Michigan Blue Cross demanded the MFN-plus agreement, which prevented competitors and all non-Michigan Blue Cross purchasers and insureds from obtaining competitive discounts at Marquette General.  Michigan Blue Cross believed that its contract with Marquette General would, in Michigan Blue Cross' own words, "keep blue lock on U.P."

56.     Michigan Blue Cross increased the prices it pays other hospitals in the Upper Peninsula to induce the hospitals to agree to MFN agreements.  Michigan Blue Cross paid Schoolcraft Memorial a price increase in exchange for accelerating by six months the hospital's commitment to charge all other payers at least as much as it charged Michigan Blue Cross.

57.     Defendant's MFN arrangements with Peer Group 5 hospitals and with Dickinson County Hospital (a hospital that is also subject to an MFN agreement) prevent these smaller hospitals in the Upper Peninsula from agreeing to lower prices for Michigan Blue Cross'

20

competitors and all non-Michigan Blue Cross purchasers and insureds. Defendant's MFN agreements with Marquette General and other hospitals in the Upper Peninsula have unreasonably lessened competition in the market for commercial health insurance in the central and western Upper Peninsula, and caused an artificial inflation in the price of hospital services for non-Michigan Blue Cross purchasers.

### 2. The Lansing Area

58.     In June 2009, Michigan Blue Cross entered into a ten-year provider agreement with Sparrow Hospital, the largest hospital in the Lansing area. That contract includes an MFN-plus clause that requires Sparrow to charge other insurers at least 12% more than Michigan Blue Cross pays. That contract also provides that Michigan Blue Cross would raise its rates to Sparrow by $5 million per year more than under Michigan Blue Cross' standard contract with similar hospitals. This MFN-plus agreement likely will result in a price increase in 2011 to the third largest insurer in Lansing.

59.     The two largest hospitals in the Lansing area, and the only ones that offer tertiary care, are Sparrow Hospital and Ingham Regional Medical Center ("IRMC"). Each of these two major hospitals has strengths in different fields. Lansing area employers and employees generally prefer health insurers that can provide network access to (and discounts at) both hospitals. Consequently, each of these hospitals is important to health insurers that seek to offer a provider network in the Lansing area. Without access to both hospitals at competitive rates, insurers cannot offer health insurance plans to Lansing area employers or residents on terms or at premiums that would be competitive with Michigan Blue Cross products.

60.     Michigan Blue Cross is by far the largest commercial health insurer in the

21

Lansing area, with approximately 70% of insured lives.  The three largest commercial health insurers in the Lansing area, which in the aggregate insure 93% of residents with commercial group health insurance in the Lansing area, are Michigan Blue Cross, Physicians' Health Plan ("PHP"), which is owned by Sparrow's parent, and McLaren Health Plan, which is owned by McLaren Healthcare Corporation, the owner of IRMC.  Each of these three health insurers has competitive discounts at both Sparrow hospitals.

61.     Sparrow and IRMC agreed in 2006 to contract with each others' health plans at favorable, "mutual and equitable" rates, to obtain comparable rates for each of their own health plans at the competing hospital.  Consequently, PHP and McLaren are the only health insurers that obtain hospital services in the Lansing area at rates comparable to the rates paid by Michigan Blue Cross.  Other insurers do not receive competitive prices.

62.     Defendant's MFN agreement with Sparrow provides that Sparrow's existing agreements with other insurers are grandfathered until January 1, 2011.  After that date, Defendant's MFN agreement will likely require Sparrow to raise prices to McLaren.  The resulting higher costs will reduce McLaren's effectiveness as a competitor to Michigan Blue Cross, which will likely reduce competition and raise prices for commercial health insurance in the Lansing area.  The MFN agreement with Sparrow also prevents other potential entrants into the Lansing area, such as Priority Health and Health Plus, from entering the market in a manner that would create effective price competition to Michigan Blue Cross.

63.     Michigan Blue Cross also has equal-to MFN agreements with the three smaller hospitals in the Lansing area: Hayes Green Beach Memorial Hospital in Charlotte, Eaton Rapids Medical Center in Eaton Rapids, and Clinton Memorial Hospital in Saint Johns.  The adoption of

22

an MFN agreement caused Eaton Rapids and Hayes Green Beach to increase their prices to Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds by significant amounts.  Defendant's MFN agreements with these smaller hospitals in the Lansing area have also prevented Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds from obtaining better rates than Michigan Blue Cross at these hospitals. Rather than providing a means to ensure that Michigan Blue Cross would pay the lowest prices paid by its competitors, the MFN agreements had the opposite effect — raising the prices paid by Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds.

64.    Defendant's MFN agreements with Sparrow and other hospitals in the Lansing MSA have unreasonably restrained trade and lessened competition, or will likely do so in the future, in the market for commercial health insurance in the Lansing MSA, and have caused an artificial inflation in the price of hospital services for non-Michigan Blue Cross purchasers.

### 3. The Alpena Area

65.    Alpena Regional Medical Center ("Alpena Regional") is the only tertiary care hospital in Alpena County and in the northeastern Lower Peninsula.  The nearest tertiary care hospitals are in Petoskey, 100 miles west, and Bay City, 140 miles south.  Alpena Regional is important to health insurers that seek to offer a provider network in the Alpena area.  Without access to Alpena Regional at rates competitive with Michigan Blue Cross' rates, other insurers cannot offer health insurance plans to Alpena area employers or residents at premiums competitive with Michigan Blue Cross products.  Currently, the only two commercial health insurers with significant business in the Alpena area are Michigan Blue Cross and Priority. Michigan Blue Cross has a market share of more than 80% in the Alpena area.

23

66.     In late 2009, Michigan Blue Cross and Alpena Regional negotiated a new contract.   Michigan Blue Cross offered a substantial rate increase "contingent on the formalization of the most favored discount."   In addition, Michigan Blue Cross sought and obtained a commitment by Alpena Regional that it would not improve the discount given to any other health insurer during the four-year life of the contract – a clause that, according to Michigan Blue Cross, "prohibits allowing better discounts to be negotiated with payors."

67.     Pursuant to Michigan Blue Cross' MFN agreement, Alpena Regional reduced Priority's inpatient discount, which increased the prices Priority pays for inpatient services significantly above the prices Michigan Blue Cross pays. The MFN agreement therefore likely resulted in a substantial reduction in competition in the sale of commercial health insurance in the Alpena area, and caused an artificial inflation in the price of hospital services for non-Michigan Blue Cross purchasers.

### 4. The Traverse City Area

68.     Munson Healthcare owns Munson Medical Center ("Munson") in Traverse City, Paul Oliver Memorial Hospital in Frankfort, and Kalkaska Memorial Medical Center in Kalkaska, all of which are in the Traverse City Micropolitan Statistical Area.  Munson is the only tertiary care hospital in the market, and Paul Oliver and Kalkaska are the only other hospitals in the market.  The nearest tertiary care hospital other than Munson is in Petoskey, 66 miles north of Traverse City, and is not a reasonable substitute for Munson for Traverse City residents or for insurers seeking to sell commercial health insurance to residents of the Traverse City area. Munson, Paul Oliver and Kalkaska are each vital to health insurers seeking to offer a provider network in the Traverse City area.   Without access to these hospitals at competitive rates,

24

insurers cannot offer health insurance plans to Traverse City area employers or residents at premiums competitive with Michigan Blue Cross products.

69.     Michigan Blue Cross has entered into an agreement with Munson that requires Munson to charge other health insurers more than it charges Michigan Blue Cross.  Michigan Blue Cross has entered into the Peer Group 5 PHA arrangement with Paul Oliver and Kalkaska, causing them to charge other health insurers at least as much as they charge Michigan Blue Cross.  Michigan Blue Cross has a market share of more than 60% in the Traverse City area.

70.     Paul Oliver and Kalkaska had previously agreed to grant greater discounts to Priority and Aetna than they had granted to Michigan Blue Cross.  Defendant's MFN agreements caused Paul Oliver and Kalkaska to raise their prices significantly to these Michigan Blue Cross' competitors and all non-Michigan Blue Cross purchasers and insureds.  The price increases substantially reduced Michigan Blue Cross' competitors' ability to compete against Michigan Blue Cross, which reduced competition in the sale of health insurance in the Traverse City area, and caused an artificial inflation in the price of hospital services for non-Michigan Blue Cross purchasers.

### 5. The Thumb Area

71.     There are eight Peer Group 5 hospitals in the three Thumb Counties (Huron, Sanilac and Tuscola): Caro Community Hospital, Hills and Dales General Hospital, Marlette Regional Hospital, McKenzie Memorial Hospital, Huron Medical Center, Scheurer Hospital, Deckerville Community Hospital, and Harbor Beach Community Hospital.  Michigan Blue Cross is the largest provider of commercial health insurance, with a market share of more than 75%, in the Thumb area.

72.     Each of the hospitals in the Thumb area is important to health insurers seeking to offer a provider network to residents there.  Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Thumb area employers at premiums that would be competitive with Michigan Blue Cross products.

73.     Through the Peer Group 5 PHA arrangement, Michigan Blue Cross sought and obtained MFN agreements with Thumb area hospitals with "the realization that some of the[m] are giving commercial carriers discounts that are on par with (or better than) what they give [Michigan Blue Cross]."  Michigan Blue Cross sought and obtained the MFN clause with Thumb area hospitals over the concern expressed by one hospital that such a clause would "unquestionably . . . operate to drive up costs to other purchasers." Accordingly, when that hospital accepted the MFN agreement and Michigan Blue Cross' higher payments, it raised another commercial health insurer's rates.

74.     As Michigan Blue Cross had believed, other commercial health insurers had received discounts from Thumb area hospitals that were in some cases better than the discounts obtained by Michigan Blue Cross.  As a result of the Defendant's MFN agreement, Thumb area hospitals raised these insurers' rates for hospital services to levels equal to or greater than the Michigan Blue Cross discount rate. The commercial health insurers affected by Defendant's MFN agreements in the Thumb area have paid and are paying higher prices to Thumb area hospitals as a result of the hospitals' agreeing to the MFN arrangements, rather than removing any Thumb area hospitals from their networks.  As a result, Defendant's MFN agreements with hospitals in the Thumb area have increased costs to competing insurers and to self-insured employer plans, and reduced insurers' ability to compete, thereby likely lessening competition

in the market for commercial health insurance in the Thumb area and caused an artificial inflation in the price of hospital services for non-Michigan Blue Cross purchasers.

### 6. Community Hospitals

75.     As alleged above, Michigan Blue Cross has offered community hospitals a participating hospital agreement, the Peer Group 5 PHA, under which the hospitals would be subject to an equal-to MFN agreement.  Most community hospitals have accepted this offer and receive higher payments from Michigan Blue Cross in exchange.  These agreements between Michigan Blue Cross and community hospitals have caused some hospitals to raise prices to other insurers by significant amounts – often by 100% or more. For example:

> a.     Bronson LakeView Community Hospital, in Paw Paw, in the Kalamazoo MSA, raised price to a competitor to comply with Defendant's MFN requirements.
>
> b.     At least two hospitals in Montcalm County raised price to Michigan Blue Cross competitors and all non-Michigan Blue Cross purchasers and insureds to comply with Defendant's MFN requirements. Three Rivers Health Medical Center, in Three Rivers, St. Joseph County, raised price to four Michigan Blue Cross competitors and all non-Michigan Blue Cross purchasers and insureds to comply with the MFN provisions.
>
> c.     Three Rivers Health Medical Center, in Three Rivers, St. Joseph County, raised price to four Michigan Blue Cross competitors and all non-Michigan Blue Cross purchasers and insureds to comply with the MFN agreement.
>
> d.     Allegan General Hospital, in Allegan, Allegan County, raised prices to a Michigan Blue Cross competitor to comply with Defendant's MFN requirements.
>
> e.     Spectrum Health Reed City Hospital, in Reed City, Osceola County, raised price to three Michigan Blue Cross competitors and all non-Michigan Blue Cross purchasers and insureds to comply with the MFN requirements.

27

76.     In each case, the Michigan Blue Cross competitor concluded that it needed the community hospital to be able to offer a network that would allow it to compete with Michigan Blue Cross, and thus agreed to pay, and is paying, higher hospital prices.

77.     As a result, Michigan Blue Cross' competitors' costs have increased, as have the costs of all non-Michigan Blue Cross purchasers and insureds.

78.     There are no likely procompetitive or efficiency-enhancing effects of the MFN agreements that would outweigh the actual and likely anticompetitive effects alleged in this Complaint.  The MFN agreements have not led, and likely will not lead, to lower hospital prices for Michigan Blue Cross or other purchasers or insureds.

79.     If not enjoined, Michigan Blue Cross' MFN agreements with Michigan hospitals are also likely to have anticompetitive effects in the future.  Michigan Blue Cross has entered into MFN agreements with hospitals that are essential components of a competitive provider network.  The MFN agreements preserve a pricing regimen that is sufficient to limit or prevent effective competition.  Absent an injunction, Michigan Blue Cross will continue current MFN arrangements and seek to enter into and enforce MFN clauses with other hospitals in Michigan, with the purpose and likely effect of preventing effective entry or expansion by its competitors. The consequence, among others, is an artificial inflation in the price of hospital services for self-insured employer health plans and other non-Michigan Blue Cross purchasers.

## CLASS ALLEGATIONS

80.     Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  All requirements of Fed.R.Civ.P. 23 (a), (b)(2), and (b)(3) are satisfied.

81.     The Class to be certified is defined as follows:

All persons or entities that paid for Hospital Healthcare Services at a rate contracted for by Michigan Blue Cross or one of its insurer competitors directly from a hospital with which Michigan Blue Cross entered into an agreement that included a "most favored nation" clause ("MFN") from January 1, 2007 to the present (the "Class Period").

82.     The Class includes entities such as group and individual commercial health insurance plans, employer sponsored health insurance plans, self-insured employer health insurance plans, business entities, and individuals whose co-pays are a percentage of the payment by the principal entity subject to artificially inflated prices caused by Defendant's MFN agreements.

83.     The members of the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such entities and individuals is currently unknown, Plaintiffs believe that the number of class members is sufficiently numerous to warrant class certification.

84.     There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members, including, but not limited to:

a.      whether Defendants violated the Sherman Act through use of Equal-to MFN or MFN-plus contracts;

b.      whether Defendants violated the Michigan Antitrust Reform Act through use of Equal-to MFN or MFN-plus contracts;

c.      Whether Defendant's Equal-to MFN or MFN-plus contracts constitute *per se* violations of the federal and state antitrust laws specified above;

d.      Whether Defendant's Equal-to MFN or MFN-plus contracts constitute violations of the federal and state antitrust laws specified above;

e.      Whether Defendant's actions caused injury to Plaintiffs and the Class in the form of inflated prices for hospital services;

29

85.     Plaintiffs' claims are typical of those of the Class.  Plaintiffs, like other members of the Class, were injured by Defendant's illegal agreements and conduct by having to pay inflated prices for Hospital Healthcare Services.  The inflated prices paid by Plaintiffs and the Class were the result of substantially similar contract provisions and common business practices that affected all Class members in a similar way.  Plaintiffs challenge Defendant's unlawful Equal-to MFN and MFN-plus agreements and business practices under legal theories common to all Class members.

86.     Both Plaintiffs and the undersigned counsel are adequate representatives of the Class.  Plaintiffs are members of the Class.  Given Plaintiffs' losses, Plaintiffs have the incentive and are committed to the prosecution of this action for the benefit of the Class.  Plaintiffs have no interests that are antagonistic to those of the Class or that would cause them to act adversely to the best interests of the Class.  Plaintiffs have retained counsel experienced in class action litigation, including antitrust violations and business torts.

87.      This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(1) and (c)(4) because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.  This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

88.     This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only

individual members of the Class and because a class action is superior to other methods for the fair and efficient adjudication of this action.  Plaintiffs are aware of no difficulties which would render the case unmanageable.

89.     Plaintiffs and members of the Class have all suffered, and will continue to suffer, antitrust injury and damages as a result of Defendant's Equal-to and MFN-plus contracts and related unlawful conduct.

## COUNT I

**(*Per Se* Unlawful Agreement in Violation of § 1 of the Sherman Act)**

90.     Plaintiffs repeat and reallege the allegations of the above paragraphs.

91.     Defendant's Equal-to MFN and MFN-plus contracts are *per se* violations of the antitrust laws.

## COUNT II

**(Unlawful Agreement in Violation of § 1 of the Sherman Act under the Rule of Reason)**

92.     Plaintiffs repeat and reallege the allegations of the above paragraphs.

93.     While the MFN Agreements are *per se* illegal and require no allegations of market definition, those agreements are also illegal under the Rule of Reason.

94.     Each of the provider agreements between Michigan Blue Cross and one or more of the Michigan hospitals described in this Complaint and containing an Equal-to MFN or MFN-plus provision is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

95.     Each of the challenged MFN agreements with Michigan hospitals has had, or is likely to have, substantial and unreasonable anticompetitive effects in the relevant markets

(defined below), including but not limited to:

      a.      Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurers in competition with Michigan Blue Cross from obtaining competitive pricing from hospitals;

      b.      Unreasonably restricting the ability of hospitals to offer to Michigan Blue Cross' competitors or potential competitors or other purchasers reduced prices for hospital services that the hospitals and insurers consider to be in their mutual interest;

      c.      Unreasonably limiting entry or expansion by competitors or potential competitors to Michigan Blue Cross in Michigan commercial health insurance markets;

      d.      Raising the prices of hospital services to commercial health insurers in competition with Michigan Blue Cross, self-insured employer health plans, and to other purchasers of hospital services; and

      e.      Depriving purchasers of hospital services of the benefits of free and open competition.

96.      The procompetitive benefits, if any, of these provider agreements do not outweigh the actual and likely anticompetitive effects of the agreements.

A.      **<u>Relevant Product Markets</u>**

      **Sale of hospital services**

97.      The sale of hospital services is a relevant product market, and it is the artificially inflated price of hospital services that has directly harmed Plaintiffs.  Defendant's MFN agreements have fixed and inflated the prices for hospital services in the Relevant Geographic Markets (defined below) to all non-Michigan Blue Cross purchasers, including Plaintiffs and the Class.  Michigan Blue Cross' market power in markets for commercial health insurance is sufficient to allow it to coerce agreements by hospitals concerning the prices hospitals charge for Hospital Healthcare Services that artificially raise the price of hospital services.

Commercial health insurance excludes government programs such as Medicare and Medicaid, and alternative products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid. Commercial health insurance includes self-insurance arrangements described above. The markets for commercial health insurance are more fully described below.

**Commercial group health insurance**

98.     The sale of commercial group health insurance, including access to a provider network, is a relevant product market. Health insurers compete for customers on the breadth and quality of their provider networks, on premiums, and on the customer's cost of using providers, among other factors. Group health insurance sold in Michigan usually includes access to a provider network, and most employers and insureds consider an insurer's provider network to be an important element of a health insurance product, because the network specifies the physicians and hospitals to which patients can turn for service with substantially lower costs to them.

99.     There are no reasonable alternatives to group health insurance, including access to a provider network, for employers or for most employees. Individual health insurance typically is significantly more expensive than group health insurance. Virtually all individual health insurance is purchased by persons who do not have access to employer-sponsored group health insurance.

**Commercial individual health insurance**

100.     The sale of commercial individual health insurance, including access to a provider network, is also a relevant product market. Some Michigan residents without access to

33

group health insurance purchase individual health insurance directly from commercial health insurers.  Individual health insurance is the only product available to individuals without access to group coverage or government programs that allow them to reduce the financial risk of adverse health conditions and to have access to health care at the discounted prices negotiated by commercial health insurers.  There are no reasonable alternatives to individual health insurance for individuals who lack access to group health insurance or government programs such as Medicare and Medicaid.

101.    Purchasing hospital services directly, rather than through a commercial insurer, is typically prohibitively expensive for most groups and individuals.  Patients without health insurance almost never purchase hospital services directly from hospitals at prices comparable to prices paid by Michigan Blue Cross.

102.    Defendant's MFN agreements apply to hospital services procured for both group and individual commercial health insurance plans, and have the effect of fixing and artificially inflating the prices of Hospital Healthcare Services to purchasers such as Plaintiffs and the Class. Both group and individual commercial health insurance are referred to herein as "commercial health insurance."

**B.     Relevant Geographic Markets**

103.    Markets for hospital services and commercial health insurance, including access to a provider network, are local. One key component of commercial health insurance is access to a provider network, including primary and tertiary care hospitals.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health insurance plans that provide access to networks of hospitals and physicians close to their homes and workplaces.

34

Employers offering group health insurance to their employees therefore demand insurance products that provide access to health care provider networks, including primary and tertiary care hospitals, in the areas in which substantial numbers of their employees live and work.

104.    Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live and work.

105.    The relevant geographic market for the purpose of analyzing the effect of an MFN agreement between Michigan Blue Cross and a hospital on the sale of hospital services is the area in which the seller operates and in which the purchaser can practicably turn for services.

106.    Because an insurer is selling access to a provider network, among other things, the relevant geographic market for analyzing the effect of an MFN agreement between Michigan Blue Cross and a hospital on the sale of hospital services is the area in which the hospital subject to the MFN agreement operates and in which purchasers of hospital services and insureds can practicably turn for hospitals included in the provider network offered for sale as part of a commercial health insurance product.

107.     For example, the relevant geographic market for analyzing the effect of the MFN agreement between Michigan Blue Cross and Edward W. Sparrow Hospital ("Sparrow"), in Lansing, is the Lansing Metropolitan Statistical Area ("MSA").  Lansing area purchasers and insureds cannot practicably turn to commercial health insurers that do not offer network access to hospitals in the Lansing MSA.  (MSAs and Micropolitan Statistical Areas are geographic areas defined by the U.S. Office of Management and Budget.)

108.    The following geographic areas are relevant geographic markets for the sale of

35

hospital services and commercial health insurance:

a.       The western and central Upper Peninsula (Alger, Baraga, Delta, Dickinson, Gogebic, Houghton, Iron, Keweenaw, Marquette, Ontonagon, and Schoolcraft Counties), where Michigan Blue Cross has more than 65% of commercially insured lives;

b.       The Lansing LISA (Ingham, Clinton and Eaton Counties), where Michigan Blue Cross has approximately 70% of commercially insured lives;

c.       The Alpena area (Alpena and Alcona Counties), where Michigan Blue Cross has more than 80% of commercially insured lives;

d.       The Traverse City Micropolitan Statistical Area (Benzie, Grand Traverse, Kalkaska and Leelanau Counties), where Michigan Blue Cross has more than 60% of commercially insured lives;

e.       The "Thumb" area (Huron, Sanilac and Tuscola Counties), where Michigan Blue Cross has more than 75% of commercially insured lives;

f.       Each of the Detroit, Flint, Kalamazoo, and Saginaw MSAs, and the Alma and Midland Metropolitan Statistical Areas, in each of which Michigan Blue Cross has more than 50% of commercially insured lives;

g.       The Grand Rapids MSA, where Michigan Blue Cross has more than 45% of commercially insured lives; and

h.       Each of Allegan, Iosco, Montcalm, Osceola and St. Joseph Counties, in each of which Michigan Blue Cross has more than 40% of commercially insured lives.

109.    In addition, on information and belief, there are additional relevant geographic markets in the State of Michigan, not yet identified by Plaintiff, characterized by an exercise of market power by Michigan Blue Cross such that Michigan Blue Cross is successful in arranging MFN contracts with hospitals that artificially increase prices for hospital services in the area. With regard to the geographic markets described above, Michigan Blue Cross has an MFN

agreement with at least one significant hospital in each geographic market specifically identified.  In the western and central Upper Peninsula, and in the Lansing, Detroit, Flint, Grand Rapids, Kalamazoo and Saginaw MSAs and the Alma and Midland Micropolitan Statistical Areas, Michigan Blue Cross has MFN-plus agreements with at least one significant tertiary care hospital.  In the Thumb and in Allegan, Iosco, Montcalm, Osceola and St. Joseph counties, Michigan Blue Cross has MFNs with all of the hospitals in the market; all are community hospitals.

110.    The geographic markets identified above approximate the areas served by the hospitals currently subject to Defendant Michigan Blue Cross' MFN agreements, and approximate the areas in which a commercial health insurer requires a provider network, including primary and tertiary care hospitals, in order to be an effective competitor in that area. Most employed residents of each of these areas work within the area.  Residents of these areas generally tend to use the tertiary care hospitals, if any, within these areas for tertiary care hospital services.  Therefore, commercial health insurers believe they must include in their networks tertiary care hospitals in these areas in order to compete effectively in the sale of commercial health insurance to employers and residents of these areas.

111.    Commercial health insurers believe they must include community hospitals within these areas in order to be able to compete effectively in the sale of commercial health insurance to employers and residents of these areas.  Michigan Blue Cross' competitors have paid higher prices at community hospitals in these areas as a result of Defendant's MFN agreements, rather than drop the community hospitals from their networks.

112.    Commercial health insurers that offer any HMO product are required by

Michigan insurance regulations to include in their HMO networks nearby hospitals for any location in which an HMO product is offered. Those hospitals include community hospitals that are the only hospitals in certain of the specific geographic areas identified above. Several of the health insurers seeking to compete with Michigan Blue Cross primarily offer HMO products, and approximately 40% of Michigan insureds covered by non-Michigan Blue Cross commercial health insurance participate in HMOs.

113.    The residents of the specific geographic areas identified above, and their employers and insurers, are the customers currently identified as most likely to be affected by Defendant Michigan Blue Cross' MFN agreements. Employers and individuals likely would not reduce purchases of commercial health insurance from commercial health insurers with provider networks in the specific geographic areas identified above in response to prices above competitive levels by a sufficient amount to make prices above competitive levels over a sustained period of time unprofitable for a monopoly supplier of commercial health insurance in those markets. The sale of hospital services in each specific geographic area identified above is a properly defined relevant market for the purpose of analyzing the effects of Defendant's MFN agreements on the price of hospital services procured for both group and individual commercial health insurance plans under the antitrust laws.

### C.  Michigan Blue Cross' Market Power

114.    Michigan Blue Cross has market power in the sale of commercial health insurance in each of the alleged relevant geographic markets. Michigan Blue Cross has a demonstrated ability to exercise market power by, among other things, raising prices, restricting output, erecting barriers to entry, and excluding competitors. Michigan Blue Cross has

sufficient market power in the sale of commercial health insurance to allow it to successfully pressure hospitals into MFN agreements that artificially inflate the prices hospitals charge for hospital services in each of the alleged relevant geographic markets.

115.    Michigan Blue Cross' market power in commercial health insurance markets is durable because entry into the alleged markets is difficult.  Michigan Blue Cross has a large customer base that will not shift easily to a new competitor.  Effective entry into or expansion in commercial health insurance markets requires that a health insurer contract with broad provider networks and obtain hospital prices and discounts at least comparable to the market's leading incumbents.   The purpose and effect of Defendant's MFN agreements is to prevent competing insurers and potential entrants from obtaining discounts from hospitals that would allow them to compete more effectively with Michigan Blue Cross.

## COUNT III

### (Violation of the Michigan Antitrust Reform Act, MCL § 445.772)

116.    Plaintiffs repeat and reallege the allegations of the above paragraphs.

117.    Defendants entered into Equal-to or MFN-plus agreements with at least 60 Michigan hospitals that unreasonably restrain trade and commerce throughout the State of Michigan in violation of Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

118.    Defendant's MFN contracts are *per se* violations of Michigan's antitrust laws. Further, the procompetitive benefits, if any, of these provider agreements do not outweigh the actual and likely anticompetitive effects of the agreements.

119.    Defendant's conduct was not intended to, nor did it have the effect of, reducing the cost of healthcare.

120.    Defendant's challenged conduct was not permitted by the Commissioner of the Office of Financial and Insurance Regulation.

121.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have sustained antitrust injury and damages in amounts which are presently undetermined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Honorable Court:

A.    Certify the action as a class action pursuant to Fed.R.Civ.P. 23 and appoint Plaintiffs and their Attorneys as class representative and class counsel respectively;

B.    Adjudge and decree that the provider agreements between Michigan Blue Cross and the Michigan hospitals that contain Equal-to MFN or MFN-plus provisions are *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772;

C.    Reform Defendant's MFN contracts with providers to strike the illegal terms and enjoin Defendants from agreeing to, or enforcing, similar provisions in the future;

D.    Award Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the costs of this action including attorneys' fees;

E.    Enter judgment against Defendant Michigan Blue Cross, holding Defendant liable for the antitrust violations alleged;

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: December 8, 2010

Respectfully submitted,

/s/Bryan M. Beckerman
John I. Tesija (P36709)
Michael A Novara (P64388)

40

Bryan M. Beckerman (P51925)
**NOVARA TESIJA, P.L.L.C.**
2000 Town Center, Suite 2370
Southfield, Michigan 48075
Telephone:  (248) 354-0380
tesija@novaratesija.com
man@novaratesija.com
bmb@novaratesija.com

Daniel A. Small
Benjamin D. Brown
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC  20005
Telephone:     (202) 408-4600
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com

L. Kendall Satterfield
Don A. Resnikoff
Michael G. McLellan
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
dresnikoff@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com

Counsel for Plaintiff

41